All right, is everyone ready? Okay, Mr. Christ. Good morning, Your Honors. I may please the Court, Matthew Christ for Mr. Wells, who is present with me today. Your Honors, I would like to reserve three minutes for rebuttal. Your Honors, this matter comes before the Fourth Circuit after the District Court granted 12b-6 motions and 12b-1 motion on a conflicted record, factually complex matter, and with substantial disagreement both amongst the defendants, amongst themselves, and also in conflict with the complaint that was before the Court. Fundamentally, this case starts on February 9th, 2020, and unfolds a case that has changed Mr. Wells' life. This story started with Mr. Armstrong, who is a civilian. He is an employee of the Department of Defense. He is not a military member at the time. This is not a military adjacent officer. This was a civilian employee of the DoD. He viewed Mr. Wells from within Arlington Cemetery, from a pretty far remove, Your Honors, and so he viewed Mr. Wells and took a number of minutes to exit Arlington Cemetery, to come around through Fort Meyer, to exit Fort Meyers Gate, and then park his vehicle behind Mr. Wells' car. Mr. Wells, as observed by Mr. Fuentes, Mr. Wells was not free to leave when Mr. Fuentes later arrived, an Arlington County police officer, and so at that time Mr. Armstrong detained Mr. Wells and had no basis for it whatsoever. Just to make sure I understand where the rub is there, I think I do. If Mr. Armstrong had instead pulled up beside Mr. Wells, you agree there would be no claim against Mr. Armstrong? No, Your Honor. There's two different parts of that as well. I think it does make Mr. Armstrong's case stronger. However, the interaction afterwards between Mr. Armstrong and Mr. Wells, which is, I think, a case of disagreement, Mr. Wells very clearly articulated he believed he was not free to leave, even from the verbal interaction, and so at that point, as soon as Mr. Armstrong approached Mr. Wells' vehicle, Mr. Wells at that point was in a reasonable apprehension that he was not free to leave and therefore detained for the purposes of the Fourth Amendment, Your Honor. Fundamentally, there was no reason for Mr. Armstrong to engage with Mr. Wells. He did not, at that time, and I'm stepping forward to respond to Mr. Armstrong's assertion that there was this community caretaker exception, there was no call for medical care, there was no report of anything having to do with a person who may be in medical need or anything along those lines. There's no, there was no welfare check and no community caretaker. Your position is, our sort of fundamental idea here is, like, did the officer act in a reasonable manner? We can talk about what buckets it might go in or not, but your suggestion is that it would have been reasonable, given what he saw, to stay in the cemetery and, you know, go about his business? I think that's the only appropriate thing that Mr. Armstrong could have done, Your Honor, yes. When did this occur? What was the date? February 9th, 2020, Your Honor, and also there were very few vehicles around. There's no report of misconduct by Mr. Wells. For example, there's no calls to the police by anyone other than Mr. Armstrong, and I think I would say... And Officer Armstrong didn't actually search the vehicle himself, correct? The other officers that were called to the scene because the license plate had expired, they conducted the search of the vehicle, correct? Mr. Armstrong participated in the search, yes, for approximately 30 minutes or so. His voice can be heard on the audio recording that has been submitted. In that audio recording, you'll hear a male voice ask, Mr. Wells, where did you detach from? The male voice then speaks about his own military service, and I would suggest... So participating in the search, by that you mean continued to have communication with Mr. Wells? The voice, who I believe is Mr. Armstrong, is also heard, I believe, on a phone call calling back to someone else. He's investigating, is the point. Okay, but he's not in the vehicle rummaging around? I believe he was, Your Honor, yes. And based on what? And again, there was no discovery in this case, so it's, I mean, it's very difficult for me to answer that question, Your Honor. I think there should be a robust discovery in this case, and in that we would get that set and clear. But in short, Your Honor, Mr. Armstrong violated the Fourth Amendment. Whether his violations were more egregious by searching the vehicle is a question to be determined. And you have a number of allegations in this case, because, I mean, so many events unfolded. What do you think is your strongest argument? I think the primary issue is this interaction between Armstrong and Mr. Wells. He clearly apprehended him or detained him without reason, and then that set into the sequence of events of the malicious prosecution and the harms to Mr. Wells. I think the second part of it is the Arlington County Police officers, I'll refer to them by group, the ACPD officers who appeared on February 9th, jointly worked together to search his vehicle without any justification. And of course, they're saying that they were relying on what relate to them, and I think there's case law that says that they can. I understand, Your Honor, that may fly if there were not this community caretaker exception, and so they can't have it both ways. Armstrong can't simultaneously have a community caretaker exception to his encounter, and then the only report that he makes that's in paper is a suspicious person and five officers come out from Arlington County Police Department. Right, but they were going to have to show the vehicle because it had an expired license. At least that's what they, that's what the officers said they were going to do. The, that is a very, you know, the timeline is very important with this, Your Honor, because you can hear in the audio clip that they're searching the vehicle. Mr. Wells is asking what are they doing, why are they doing that? They're searching the vehicle long before... Because he asked him if he, they asked if he had weapons in the vehicle, and he said he did, so they were searching the vehicle for that. There's the, I think the most important issue from the Crow-Marty case and also from Arizona began, that it is inappropriate for them to take that as a carte blanche, that they can view anything in the vehicle and pull out anything in the vehicle. And also, Your Honor, in Commonwealth versus Hill, there was a firearm that was, and I'm sorry, this is a Virginia Circuit Court case, so it's not a federal case, but in the court addressed that just because Hill possessed a firearm and there was a firearm in view in the vehicle, it was not appropriate for the officers to then investigate and search and seize. And what was their stated reason for saying that they were going to need to tow the vehicle? The stated reason by the defendants is that because the temporary paper tag that was approximately four months expired was expired. Right, so they said they were gonna need to tow the vehicle and then for everyone's safety and for protection of whatever might be in the vehicle of value, they gave Mr. Wells the opportunity to, for them to take it over, if he could find a ride or somebody that could come and get him and the firearms, correct? That is the pleading from the defendants, Your Honor, and there's sort of a choose-your-own-adventure kind of exception to the Fourth Amendment and it's hard to hit all of these moles. The problem is, is the vehicle search exception doesn't, they have to do this according to policy. The South Dakota Vioperman... Does it have to be a mandatory policy? So I take, maybe this isn't your argument, and so if I'm wrong, help me, but so if the, if, it's hypothetical, right? So don't tell me I'm wrong about the facts, right? But if a police department has a policy that says you may tow a car with out-of-date tags and if you tow the car you must do a inventory search of it and that's the policy and that's the extent of the policy. It's super clear, right? Whatever. Can an officer shows up and the officer expired and they say, all right, I'm gonna tow the car and they do an inventory search. Is that permissible? Your Honor, I will address your question. I was responding to the vehicle... No, I'm totally changing it. I'm asking a different question. Yep, I'm totally asking a different question. That's what we get to do. Yes, Your Honor. So the, there is a permissive policy, yes, absolutely, and so the argument is not so much that they could not tow the vehicle. That's not the argument. That's not the Fourth Amendment violation. The searches happened long before they made the determination that that Mr. Wells could not find a person to come to him, and you can hear that in the timeline in the audio recording, that Mr. Wells was still speaking to friends while two of the officers from a remove are discussing Mr. Wells and they have choice words to say about him that they don't believe him. They don't believe, they said that they're gonna take everything. And you think the Fourth Amendment requires, so they, so they have a policy, they can do an inventory search, but if they offer him the chance to have a somebody come pick him up, that somehow now imposes a Fourth Amendment obligation to not conduct the inventory search? The problem is that they did not do a vehicle inventory search appropriately in violation of the Fourth Amendment, and that's, that's the main thrust of the argument. In other words, that it needed to be done, what? Like what did they not do? On the inventory search, I get, as Judge Thacker rightly says, like you've raised 17 issues, right? But, but on the inventory search itself, where they found the plate, let's just focus on that, help me understand, what is your argument for why they were not permitted to do that, given that he had expired tax? The, the Fourth Amendment injury, from, from South Dakota to Vopermann, there's three valid purposes. They need to protect the property owner's vehicle, property within the vehicle, protect against claims of theft or damage, or to protect the police from things like bombs, etc. So that's why you have a policy, right? It's not a requirement that those reasons be invoked every time the policy is used. That's why you can have an inventory search policy. But the officers don't need to write out the reasons why they're doing it, they're just following the policy. They get to follow the policy. If they had followed the policy, they would have a better argument, but I still think that there's Fourth Amendment violations replete throughout this factual pattern, Your Honor. And part of the primary issue is, they did not remove all of his personal property. Notably, they left, and you can hear it in the recording, and it's kind of complicated to explain it, but they even tell Mr. Wells, make sure you have your laptop. He took his laptop with him, left it in the vehicle. So there was very expensive property that was left in the vehicle, and also the policy requires an inventory, and for that to be given to Mr. Wells. It was not given to Mr. Wells, and he did not sign an inventory of what was in the vehicle. So there's numerous policy violations, even if it is permissible, and the higher-level issue is that... Your argument is that if, except hypothetically, that they were required to get his signature on an inventory, that that technical violation is itself a Fourth Amendment violation? I'm just trying to understand how we get to where you're going. That's the best argument. If it's not, if they don't take everything out of the car, and they don't get his signature, that that is a Fourth Amendment violation. It's worse than that. It demonstrates that they're only using very important exceptions to the Fourth Amendment as a pretext to rummage through his belongings. It is evidence of the further Fourth Amendment violation. It's a gross violation of the Fourth Amendment, and all searches are unreasonable, necessarily unreasonable. Have you read a case called Wren before? W-R-E-N. W-R-E-N. I have reviewed that. I don't recall it offhand, your Honor. Okay, so it says we don't really care about pretext, right? If they've got a basis for doing it under the Fourth Amendment, we don't ask about their subjective intentions. You can say whether that's right or wrong, but it sort of binds us. So why would I, even if you were right, even if it was evidence that they had all these really terrible motives, why does that matter to me? Because those are subjective ideas, even if you could prove them, and I have to ask under Wren the objective question of whether they had a valid basis to search the car. Well, and that's the, I think, the main thrust of this, is that all warrantless non-consensual searches are unreasonable, and therefore qualified immunity does not attach, unless they have one of these exceptions, and they've gone through the community caretaker to justify the initial view, the vehicle search exception, these are all, they don't apply, they didn't follow the policy, and therefore they didn't actually use the vehicle search exception, and you can hear it in the, when the police officers speak to each other. Is that the inventory exception or are you talking about a different exception? Yeah, yeah, there is, there are multiple exceptions, again, it's sort of a game of whack-a-mole of what the defendants are arguing, but the... I'm not sure that, there is a game of whack-a-mole, I'm not sure it's whether the defendants arguments or not, but... The primary issue is just, if they don't abide by the, they're initially unreasonable, the search is unreasonable, they could have viewed the firearms and made sure that Mr. Wells didn't touch them, which they did, he was handcuffed sitting on a curb, so that their safety is ensured, they don't have the authority to search the rest of the vehicle, they did not at that time know that they were going, this is very early on, first 20 minutes of the audio clip, they did not know at that time that they would have to tow the vehicle, so that's, that's the issue, is that the vehicle was not in police custody, they have to go, and that's, that's the South Dakota Viaperman case, that they have to go through these policies appropriately, your honor, otherwise they're just given carte blanche to violate the Fourth Amendment, search any vehicle that they come across, it's just inappropriate, your honor. And the second main issue here is that they argue, and the district court agrees, that there was consent, and there's no consent in the audio clip, Mr. Wells merely gave up, and that cannot be consent to give up one's Fourth Amendment rights, they read in his memorandum. Wait, didn't they know, right, they knew Officer Armstrong noticed right away that the temporary license plate was expired, that's why he called the other officers, and so that's what required the vehicle to be towed, so right at the inception, they knew the license plate was expired, that's why they were there, so it was going to be towed, which triggers the inventory search. I disagree that it triggers the inventory search exception if they don't follow the policy. Well that's their argument. I understand, and so the timeline of that is very important. If they don't follow what policy, because they didn't give him the inventory search return, correct? They didn't take everything, they didn't give him the inventory, and he did not consent, is an important point as well, your honor. The the timing of, I'm sorry, you go ahead, the timing of when they knew that they had to tow the vehicle is very important because they discussed with him, and Mr. Wells was on the phone, you can hear it in the audio clip, he's on the phone attempting to find somebody, and so the officers said that they were not going to tow the vehicle if he could find somebody to come. Right, if he could find somebody, but if not, they knew they were going to tow the vehicle, and you have some time on rebuttal. Yes, your honor. Thank you. You have three minutes on rebuttal, so we'll hear from you again then. All right, next counsel. Yeah, I think that, are you Mr. Fuchs? Yeah. I have you as going next. You go first, and you have 12 minutes? Okay, go ahead, Ms. O'Brien, and can you change it to 12 minutes, please? Thank you. All right, now we're back on track. Go ahead. Good morning, your honors. My name is Blair O'Brien. I'm here today on behalf of Appalese Fuentes, Wannick, Lugasse, Solis, Klein, and Vannick, and may it please the court. The district court did not err when it concluded that the allegations in the second amendment complaint, as clarified by the exhibits that were fairly incorporated into that complaint, into which the appellant did not object in the trial court, did not state a claim against my clients. I have to disagree with with my colleague that the district court engaged in fact-finding and resolved the merits of factual issues as part of entering its opinion in the case. On the contrary, the district court evaluated recorded statements, the content of which is not in dispute, and then made legal conclusions as to whether these officers' actions were objectively reasonable in light of those undisputed statements, those undisputed facts. The district court did not err in doing so, and it correctly concluded that my clients acted reasonably. There are two parts to this case, really. They're almost two separate cases. The first being... There's a lot of parts to this case. I have to agree with Your Honor there, yes. But if we're looking at two separate events, I suppose, the February 9th stop is one which the court just heard a substantial amount of argument about, and then the second is the investigation subsequent to that that led to the charge. I'll address the February 9th stop first, but I'm also happy to entertain any questions. As the court is aware, Appley Armstrong initially conducted the stop. By the time any of my clients arrived on scene, the stop was well underway. So in light of that, they were relying on Officer Armstrong's conclusions as to whether or not a stop was appropriate in responding to the call to assist that their agency received. The appellant is asking the court to adopt a new rule requiring assisting officers, later responding officers, to engage in their own fact-finding mission upon arriving at a scene to make sure that everything is above board. He's also saying that they didn't follow the policy for impounding the vehicle. What's your response to that? Your Honor, I think the record as it stands right now is not clear. I have my thoughts about where it will stand after discovery if that happens. But the bottom line is the record is very clear that they believed that they were conducting an inventory search. Well, if the record is not clear, should discovery happen? I don't think it's necessary at all, Your Honor, because the issue here... So where can we find the policy in the record? The policy, there are no allegations actually about the policy and whether or not policy was followed, what the policy is and how it was not followed in the complaint. Didn't somebody testify at some point as to what the policy was? One of the officers that they... There was testimony at the preliminary hearing in General District Court, Your Honor, yes. And what the policy was, was if a vehicle could not be driven away from the scene, which this vehicle could not, it had to be towed. And if it's going to be towed... And it could not because it was not legal, because it didn't have, because it had an expired tag, is that it? Correct, yes, Your Honor. So the registration was, I think it was actually charged under a fictitious registration statute under the Virginia Traffic Code, rather than just expired. So there's, it wasn't merely an expired tag, but nonetheless it was a faulty tag that was on this car and it could never have been driven away. It also couldn't be legally parked in the city, in the county of Arlington. So they couldn't just leave it there either. They had to move it. It couldn't stay, it had to go. Can you answer the question, you say it had to be towed. There's some testimony from, I believe it's from Jim Quintez, maybe, maybe it's somebody else. It says on occasion when it was legally parked, he would allow it to stay there. He didn't tow it every time. Are you familiar with that testimony? Yes, Your Honor. Okay. Tell me why that, does that matter or doesn't matter? You made the statement that it had to be towed. That suggested maybe that there was a discretionary policy. And does it matter if it's merely discretionary as opposed to mandatory? I don't believe it does matter as the officers, the law allows officers to use their discretion and just dealing with vehicles and what is in the community best interest, what amounts to public safety and what is required to ensure that private property is protected. I think it's unclear from Officer Fuentes' testimony whether or not he was going to leave a vehicle on public property versus say if it's in a Walmart parking lot or something like that. And why, you also mentioned, I just want to make sure I understand, that because it lacked appropriate registration it could not be parked in a public spot? Where do I find that? How do I know that? That's in the Arlington County Code and the specific section is 14.2-2A2. And so that specifies that if it is not a street legal vehicle, if it does not comply with DMV regulations, then it cannot be driven on the streets and it cannot be parked in public spaces. And so the allegation in the complaint in paragraph 27 of the Second Amendment complaint is that this was a public parking lot. So in that regard the car could not be left there. So there are perhaps other circumstances when Officer Fuentes may have used his discretion in a different way or more likely would have been on some kind of private property and would have left a vehicle there rather than do it. And then as a factual question, then I'll let you go back to the argument. Based on the record we have, I thought the officers had suggested to Mr. Wells that he could have somebody come pick him up and they could take whatever items he wanted to take with him. Not that someone could come pick up his car. That is also my understanding of the discussion and then looking at the, specifically considering the recording that has been submitted, that was the offer that was on the table. In fact they told him that they preferred for him to have someone come pick him up so he could take his valuables with him. The conversation starts at 448 p.m. where they say we got to tow your car but you can get somebody to come pick up your stuff. Yes, Your Honor. Yes, so I don't believe that there was ever a discussion that another person could come and drive the car. Mr. Wells also did not have a license on him at that point so he could not have driven any car. But that specific car could not leave under its own operation given the status of its registration. So from your perspective, at least by that point in time, they had to do an inventory search of the car. Yes, and not only that they had to do it but they absolutely reasonably believed that that is what they were doing. They informed Mr. Wells, I believe the time stamp is 437, that that's what they were doing, that they had to tow the car, that they were starting the search. So that is what they were doing throughout the process of allowing Mr. Wells time to try to contact a friend or someone else to come and take him from the scene, is that they were conducting that search. So it's not the case that they eventually decided to tow the car because he couldn't find a ride, that they were pursuing their policy all along while they were trying to find a ride for him. Is there, in your view, is there any Fourth Amendment requirement that they wait until they get to the impound lot to do the to do the inventory search? Is there a timing requirement under the Fourth Amendment that they can't do the search until a certain point in time? I don't believe there is a timing requirement. I think I've encountered different practices, Your Honor, for what's appropriate. If the car is locked and they've got chain of custody effectively on it, you could technically wait to get it to the impound and do it there, come back and do a full criminal search later if it's evidence of a crime, for example. But I think if policy dictated, if their policy dictated that they do it on the scene, then they appropriately followed that policy. So I don't think there's a Fourth Amendment implication there either way. Your Honor, I do briefly want to touch on the the Second Amendment question that has been raised. The district court did not err in listening to the video recording that we've been discussing and concluding that the officers were objectively reasonable in believing that the appellant was consenting to the placement of his firearms in safekeeping. The officers were clear, as I mentioned earlier, that the appellant, their preference was actually that the appellant retain possession of his firearms and leave with them, but they asked him to do it in someone else's vehicle so that he was not simply openly carrying a loaded assault rifle down Arlington County streets. They offered safekeeping as an alternative to that, and ultimately the appellant. Is that a crime to open carry in Virginia? It is not a crime to open carry in Virginia, Your Honor, but I suppose I would say that that's actually not the standard for a constitutional question. There are states where it is a crime to open carry a firearm of any variety, and particularly an assault weapon, and the Constitution is the same in California as it is in Virginia. So what the Commonwealth of Virginia criminalizes is not the standard for what would be a Your argument is, had he demanded to walk off with the guns and the officers had refused him, that might have raised a Second Amendment problem, but the officers were entitled to say, hey, don't you think it's a good idea for us to hold on to them, and if he agrees to that, that certainly doesn't violate his Second Amendment rights. Your Honor, I might push back a bit. I'm not sure that I would agree it would raise a Second Amendment problem. There might be other I said might, that's why I was saying, to distinguish from what we have here, which is fundamentally just a consent question, we would have to ask the question of whether that actually violates the Second Amendment. Correct, Your Honor, and so our first position is that he consented, so that's not what happened, but if the officers had affirmatively taken the guns and said, no, you can't leave with these, I still don't think that that's a Second Amendment question, Your Honor, because I don't think it's clearly established under any of this Court's precedent or the Supreme Court's precedent that there is a clearly established right to walk down the street with an assault weapon anywhere in the country at the moment. Appellant is relying on Bruin, which was of course decided two years after the facts of this case, so that would not contribute to the clearly established analysis. I do think it could implicate other amendments, like a takings question, whether or not the government can take or hold property. It could be a potentially a Fourth Amendment question of a seizure, but I don't believe that they've shown precedent that would implicate the Second Amendment specifically related to the possession of the firearms. In my brief minute I have left, I do want to separately address Detective Wannick very quickly. There are allegations in the complaint related to alleged false statements that Detective Wannick may have made to a magistrate, to the Commonwealth's attorney, or to a grand jury. Our first point is the same as to the original officers responding to the scene, that he was reasonably relying on information that he reasonably sought from a military police officer about the origin of the rifle plate that's at the heart of the prosecution. So his actions there were reasonable. I'd also point to the preliminary hearing in this case, which would function as an intervening cause for the prosecution that occurred in this case. Appellant points to the magistrate and the Commonwealth and the grand jury, but ignores the preliminary hearing at which all of these alleged false statements were sussed out and were subject to cross-examination and a probable cause determination was found. So I believe that concludes my time. I appreciate it. Thank you. Thank you very much. All right, now Mr. Pugh. Your Honors, and may it please the Court, Assistant United States Attorney Yuri Fuchs for Federal Defendants Officer Armstrong, Detective Shepard, and the United States of America. Your Honors, the Court should affirm the District Court's dismissal of the secondary claims against Federal Defendants. Plaintiff's allegations against the three Federal Defendants are a narrower set of his main claims relating to the inventory search of his vehicle on February 9th, 2020, and subsequent events thereafter. Regardless, the District Court correctly dismissed these claims for failing to meet the threshold requirements of Federal Rules of Civil Procedure 12B1 and 12B6 on plaintiff's own pleadings and plaintiff's own incorporated materials. Well, let me ask you about that because the District Court heavily relies on the, as to your client, at the exhibits attached to the complaint by Armstrong. And in looking at the District Court order, the District Court does give credit to those statements which may be in conflict with Gowans because they're self-serving statements and does not consider what is pled in the complaint by Mr. Wells. I respectfully disagree, Your Honor. The District Court does give credence to plaintiff's allegations that he was subject to a seizure and looking at the incorporated materials says there is a the District Court concluded there is one lone paragraph pled in the Second Amended complaint about Officer Armstrong's testimony at that motion to suppress hearing. Plaintiff excerpts Officer Armstrong's discussion with plaintiff after he comes upon him. What he does not excerpt is a part of that same motion to suppress hearing where Officer Armstrong explains why he came to plaintiff in the first place. There is nothing else in the Second Amended complaint that counters that reason. There's nothing in the Second Amended complaint that says Officer Armstrong's reasons were a pretext. There is nothing that says that Officer Armstrong shouldn't have believed that there wasn't a medical emergency as plaintiff argues now. There is nothing related to any kind of racial component that plaintiff raises for the first time on appeal. There is no conflict on the record that the District Court resolves and we'd also submit, Your Honor, that there is a prefatory issue of whether a Bivens claim can rise against Officer Armstrong to begin with. Well, I mean, and I was trying to, in reading the lower court's opinion as to the Bivens as to Armstrong, it almost seems as if they're saying that there is maybe a claim on Bivens on Armstrong? I think the District Court's opinion is best read as assuming arguendo. I'm going to assume arguendo that there is even though this court's decision, yeah, because there's qualified immunity. I think also to touch on qualified immunity, Your Honor, you know, even if supposedly the District Court, you know, there was a constitutional violation, there's no clearly established violation of law. Plaintiff has yet to point to one in the lower court. He does not point to one on appeal. What about the Hicks, I guess it's Hicks 2? And that, of course, that came out after briefing. Sure, so Hicks 2 deals with the Hicks 2 v. Ferreira deals with a very narrow question of whether a Bivens claim can lie against the particular U.S. Park Police officers. It involved very different facts and circumstances. It involves an issue where U.S. Park Police twice stop an individual despite him being authorized to be there. This is a very narrow instance of Officer Armstrong acting subject to a completely different statutory and regularly mandate as this court has held in Tuncoats, is actually dispositive of the new context inquiry under Bivens and implementing a welfare check. That is noticeably different from Hicks, I would submit, in three ways, Your Honor. One, Hicks never touches on claims against Department of Defense personnel, the kind that this court and the Supreme Court have repeatedly held represent an extension of Bivens. And that's regardless of whether it's against military personnel, that's regardless of whether plaintiffs are or are not military personnel, that's subject to all DOD personnel. And that's the case in this court's decision in Keokuk v. Rumsfeld, LeBron v. Rumsfeld, Doe v. Marin, and that all stems back from the Supreme Court's decision in Chappell v. Stanley. Hicks is also different because, as this court noted in Tuncoats and several other decisions, the statutory regular mandate on which an officer operates is material for determining whether it is a new context. The U.S. Park Police, as this court noted in Hicks too, are traditional line-level enforcement officers. In fact, U.S. Park Police, Your Honor, I think is one of the, if not, I think is the oldest federal law enforcement agency and has sweeping powers over certain jurisdictions. By contrast, Officer Armstrong here is operating under a confined Army mandate. He is not freewheeling going around Arlington County arresting people. He is on at Arlington National Cemetery to protect Arlington National Cemetery because that is part of his specific mandate under the auspices of the United States Army. Sorry, so to continue, Your Honors, the district court here correctly concluded on the pleadings before it, as I've noted before, that, sorry to back up, the district court correctly noted the plaintiff could not state a Bivens claim against Officer Armstrong or Detective Shepard in their individual capacities as Bivens actions were not cognizable against them or they were otherwise shielded by qualified immunity. Meanwhile, as the United States of America, the district court correctly held that the tort claims, individual tort claims brought against the federal officers had to be brought against the United States under the auspices of the Federal Tort Claims Act and that those claims were subject to dismissal under the discretionary function exception. Plaintiff's briefing on appeal and his argument here is devoid of meaningful response to a lot of these key bases. He abandons any kind of Bivens claim now against Detective Shepard. As to the Bivens claim against Officer Armstrong, he has no meaningful rebuttal to the existence of special factors counseling hesitation against the extension of a Bivens remedy. As to the grant of qualified immunity to Officer Armstrong, as I've noted before, Your Honor, he does not identify any clearly established violation of law so as to preclude the application of qualified immunity. As to the Federal Tort Claims Act, even though plaintiff below moved to strike the notice of substitution of the United States of America, he concedes here that he presented no evidence and this court's opinion in Gutierrez is on all fours requiring that even on the pleadings an individual must come forward with evidence to rebut the scope certification of a U.S. attorney once the United States is substituted for claims against individual officer defendants. And plaintiff does not show any prescribed course of conduct or policy that Officer Armstrong or Detective Shepard violated in their alleged conduct and he has no rebuttal to this court's decision in Souter as well as a Court of Appeals decision from the Ninth Circuit and several other Court of Appeals decisions that have repeatedly noted that law enforcement investigative decisions of the kind that he challenges are axiomatically shielded from liability under discretionary function exception. Your Honors, I have about 45 seconds left. I'm happy to answer any further questions or just rest on my papers. Thank you. Thank you. All right and finally Mr. Christ we're happy to hear from you again for three minutes. Thank you, Your Honors. I'll try to work backwards from Mr. Fuchs' remarks. The discretionary function test requires due care. This is not that kind of case. Congress did not pass that to protect these kinds of patients. So the the main issue with the Bivens, whether this is a circumstance counseling hesitation for an extension of Bivens, it is not. We don't have to get there because this is exactly the same as Bivens itself and Hicks. Your Honor noted that Hicks came out afterward. However, Bivens itself is line level officers investigating. That's your response to the DOD point? That he is an employee of the Department of Defense. He's a civilian employee of the Department of Defense. But there is any of our cases suggested that it turns on whether you know what position they are with the Department of Defense? I mean there are all of these cases that say whatever we want to say about lots of things like the Department of Defense is like different. There there all the Mr. Fuchs he referenced a lot of cases that I tried to tackle in the reply as much as possible. Far too much for a minute fifty. But the the primary theme of all of those cases for an example where they're talking about Stanley where I think he's a dosed with LSD and that was while he was in the military. There's the the Navy the Navy civilian I believe like social workers. That is sort of the closest that we get to connection to this a civilian employee of the DOD. In that circumstance the court doesn't turn on whether they were well first off they were not line level police officers investigating a crime as Mr. Armstrong was. So I don't think that it applies whatsoever. Though the hesitation that the court had was because they were talking about intervening with man very high level policy and not like I said a line level officer like Mr. Armstrong. There's night and day differences your honor. And I would answer the courts question no I don't believe that there are specific circumstances like this of a DOD civilian officer investigating a crime and violating the Fourth Amendment as Mr. Armstrong did. Your honors the Mr. there is a conflict in the testimony the Mr. Armstrong's testimony conflicted with Mr. Fuentes testimony in the as to how long Armstrong stayed on and Mr. Armstrong and Fuentes's testimonies also conflict with Mr. Armstrong's pleadings in the filed in this court. And he made a deal that why why does that matter? I mean I get maybe there's a difference right but it's what's material about it? I think it's a false exculpatory testimony well false exculpatory pleading indicating a guilty conscience that he knew he did something wrong and that's why he manufactured the caretaker exception. I think that it disagree about the allegedly disagree I'm not sure there's a disagreement but allegedly disagree about how long he was there? Mr. Armstrong stated that this was a brief one-minute encounter that he removed himself that's not true. Mr. Fuentes said that when he arrived minutes later that he saw that Armstrong's vehicle was still behind Mr. Armstrong Mr. Wells's vehicle in the parking lot. So that that distinction by itself I I mean I think that any false statement by a witness or by a defendant is very important but I think it demonstrates that Mr. Armstrong was aware that he had no community caretaker exception that was an after-the-fact generated argument. There was very clear indication that he the district court understood and agreed that Mr. Armstrong violated I'm over my time if I may just briefly conclude your honor. Briefly please. Your honors, Mr. Wells did not consent to the searches and seizures on February 9th and the defendants did not operate according to policy. There was no valid basis for the these Fourth Amendment violations on February 9th and the subsequent actions against Mr. Wells. The district court erred in finding qualified immunity as an affirmative defense for on the on this record and the district courts June 2nd 2023 order should be reversed in this case remanded to permit Mr. Wells to finally seek justice. Thank you your honors. All right thank you we will come down and greet counsel and ask the clerk to adjourn court until tomorrow morning.
judges: Stephanie D. Thacker, Julius N. Richardson, DeAndrea Gist Benjamin